UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| KAREN S. HITTE, <br>     PLAINTIFF <br><br> VS. <br><br> MICHAEL J. ASTRUE, <br> COMMISSIONER OF <br> SOCIAL SECURITY, <br>     DEFENDANT | CASE NO. 1:08-CV-00295 <br> (WEBER, J.) <br> (HOGAN, M.J.) |

## REPORT AND RECOMMENDATION

Plaintiff filed her application for disability insurance benefits (DIB) in July, 2003. She alleged an onset date of January 1, 2002. Plaintiff's applications were denied, both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) at Dayton, Ohio on February 2, 2006. At the hearing, Plaintiff, who was represented by counsel, testified as did Vocational Expert (VE), Brian Womer. Following an unfavorable decision in December, 2006, Plaintiff processed an appeal to the Appeals Council, which refused review in March, 2008. Plaintiff then filed his Complaint with this Court in May, 2008, and sought judicial review of the final order of the Defendant Commissioner denying her benefits.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made two errors prejudicial to her case. She first argues that she is disabled due to her need for easy bathroom access. Plaintiff contends the ALJ erred when he found that Plaintiff could perform other work when the vocational expert testified that if a person needed to leave the workspace for five minutes every hour, there would be no competitive employment available. Plaintiff's second argument is that the ALJ erred in evaluating the opinion of the treating therapist and other treating and examining source opinions.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff stated she weighed 133 lbs. and lives in a house with her husband, who is retired. She said that she last worked in July 2003 as a cook/waitress, a job that she performed for twenty three years.

She testified she can no longer work due to using an ostomy bag attributable to chronic interstitial cystitis, fibromyalgia, chronic constipation, nerves and anxiety. Plaintiff stated the ostomy bag irritates her skin, burns, leaks urine, and she has problems with the bag sticking. She also testified she has fibromyalgia with body aches all the time, especially her legs and back, constant headaches and right ear pain due to TMJ. She has not received trigger point injections or physical therapy. She takes muscle relaxers for her pain. She testified that her physicians recommended that she exercise, take vitamins and drink 10 glasses of water each day to keep herself "flushed out." Plaintiff further testified that she experiences chronic constipation for which she takes medication.

A break was taken during the hearing so that Plaintiff could change her ostomy bag. She explained that after the 30 minute drive to the hearing office, the ostomy "was pushing out when I got here and I was afraid it was going to fall off."

Plaintiff testified that she has had bad nerves most of her life and that pain "did something to her brain." She testified that she sleeps two hours at night and takes two two-hour naps during the day. She claimed that she cries daily. She also alleged that she experiences panic attacks during which she sweats and gets a bad headache, which aggravates her nervous condition. She indicated that she sees Ms. Meloy, a social worker, once a month. She reported that it is hard to say if medication and counseling are helping, but that at least it keeps her from being suicidal.

Plaintiff estimated she could walk twenty minutes and stand thirty minutes at a time and sit with no limitations, but that she would be fidgety. She reported being able to lift ten pounds. She is able to use her upper extremities to get dressed and brush her hair.

Plaintiff testified that she drove once a month, cooked easy meals, did laundry, shopped for groceries, but claimed she had panic attacks when she left her home. She goes out twice a

month. She denied using her computer at home, and testified that she quit attending church. A neighbor visits and her brother and her daughter call and may visit her.

Plaintiff indicated she could not perform a job that was not physically demanding because of fatigue, problems with her eyes focusing and inability to concentrate. (Tr. 458-78).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's hypothetical question to the VE assumed an individual who has the residual functional capacity to perform medium exertion work, with a need to alternate positions, and have easy access to restrooms. The hypothetical individual was limited to low stress jobs that did not required dealing with the public, were not fast-paced and involved minimal contacts with supervisors and co-workers. Lastly, the hypothetical individual is limited to simple tasks that did not require extended periods of concentration, and did not involve above-average production requirements. The VE responded that there would be a representative number of medium, light and sedentary jobs which Plaintiff could perform, such as laundry worker, hand packager, light assembler and injection molding machine tender, wire insulator and microfilm document preparer. The VE conceded that if the hypothetical individual needed to use the restroom 1 time per hour, for 5 minutes, no jobs would exist. (Tr. 479-82).

## OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ concluded that Plaintiff has severe impairments of "residuals of cystectomy (removal of the bladder) with ostomy bag, depression, and anxiety disorder (including posttraumatic stress disorder and possible pain disorder)." The ALJ also found that no impairment, alone or in combination, equaled or exceeded any Listing. The ALJ further found that Plaintiff had the residual functional capacity (RFC) to perform a limited range of medium work. The ALJ concluded that:

> [Plaintiff] has the residual functional capacity to: lift up to fifty pounds occasionally and twenty five pounds frequently; she must have the option to alternate positions as needed; she must have easy access to restrooms; she is

limited to simple tasks with no extended periods of concentration; and to low stress jobs with no dealing with the public, no fast-paced work, no production quotas, no above-average production expectations, or more than minimal contacts with supervisors and coworkers.

(Tr. 25). Based on vocational expert's testimony, The ALJ concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing and therefore Plaintiff was not disabled and not entitled to benefits under the Act. (Tr. 18-33).

## MEDICAL RECORD

In 1988, Plaintiff underwent hysterectomy to treat uterine prolapse and stress urinary incontinence. (Tr. 125). Plaintiff began seeing urologist, David C. Miller, M.D. in 1995. (Tr. 127-28). She was treated under the diagnosis of interstitial cystitis. Plaintiff's symptoms included urinary urgency and frequency, bloating and severe pain. (Tr. 282-86). Dr. Miller performed six cystoscopies with hydro-distention of the bladder between 1995 and 2002. (Tr. 127-28, 163-67, 177, 286). In August 2002, Dr. Miller noted Plaintiff's ongoing bladder pain, pressure, urgency and frequency. Plaintiff reported that more recently, she had "severe intractable pain." Plaintiff elected to undergo ileal loop urinary diversion surgery. (Tr. 216). A cystectomy (bladder removal), appendectomy, and an ileal urinary diversion surgery was performed August 7, 2002. (Tr. 206-18). Following this surgery, Plaintiff was required to use an ostomy bag to collect urine. Id.

Follow up records with Dr. Miller, showed no complications. Plaintiff denied any pain. (Tr. 282, 285). On October 31, 2003, the last time he saw Plaintiff, Dr. Miller reported she "is doing great." (Tr. 282). Plaintiff was "so pleased having had her cystectomy and gotten [sic] rid of the constant interstitial symptoms," she was "happy," had "no more pain," was sexually active 3 times week, and "really doing well." Id.

Dr. Miller wrote a letter to Plaintiff's counsel on February 14, 2006. He recommended that Plaintiff "drink 10 glasses of water per day to maintain her health following the removal of her bladder." Dr. Miller acknowledged that this would cause Plaintiff's ostomy bag to fill up frequently and he noted that "she needs to empty it hourly." Dr. Miller opined that Plaintiff

4

should avoid lifting more than 10 pounds at a time and should be able to sit most of the day "to avoid problems with her ostomy bag adhering around her stoma." (Tr. 443).

From February 2000 until July 2003, Plaintiff saw K. D. Fedrizzi, D.O., her long term primary care physician for complaints including sinus problems, anxiety, congestion, contusion of the right toe, ear pain, dizziness, laryngitis, yeast infection and stress. (Tr. 225-72). In November 2000, Plaintiff complained to Dr. Fedrizzi that she was unusually fatigued and cried regularly and had family stress, including her husband losing his vision and her children were having marital problems. She also complained of anxiety and nervousness. Dr. Fedrizzi noted Plaintiff was crying and had a blunted affect. He diagnosed an acute stress reaction, a major depressive disorder - moderate to severe, and chronic insomnia. He prescribed Prozac and recommended she, "seek psych eval and counseling ASAP." (Tr. 259-60). The following week, she was "doing much better" with medication and bought an exercise bicycle, which she used with her husband. (Tr. 259). In June 2001, she continued to have severe depression and was under stress, but felt somewhat better. (Tr. 252). In July 2001, she was "doing great" on Effexor and going to counseling. (Tr. 252). Plaintiff had some increased depression in October 2001 when her mother died. (Tr. 246). In June 2002, Plaintiff saw Dr. Fedrizzi for sinus problems and bladder symptoms. She reported increased symptoms since she began working more hours three months earlier. (Tr. 238). In September 2002, Dr. Fedrizzi noted that Plaintiff was "doing great emotionally s/p cystectomy" and she was more active. (Tr. 234). In December 2002, Plaintiff complained of ear pain, stress due to her son's attempted suicide, but she did not mention problems with urination frequency or use of her ostomy bag. (Tr. 233). In February 2003, Plaintiff reported that she was "doing great" with Effexor which "really helped." (Tr. 229). Plaintiff complained of left shoulder pain in July 2003. (Tr. 224, 226). X-rays were negative. (Tr. 225). She attended three sessions of physical therapy for her shoulder. (Tr. 273-76).

Plaintiff began seeing therapist, Lynn Meloy, MSW, LISW on a monthly basis in February 2001. (Tr. 346). There are no treatment records from Therapist Meloy in the administrative record. It appears that between February 2001 and January 2005, Therapist Meloy saw Plaintiff 54 times. (Tr. 342). In February 2004, Therapist Meloy, reported that Plaintiff tired

5

easily, could not pull or reach due to her ostomy bag, which Plaintiff claimed moved, she lacked energy, was forgetful, and had little ability to pay attention. Therapist Meloy further reported that Plaintiff's mood was "depressed and anxious with a depressed affect." (Tr. 356). She noted that Plaintiff stayed at home most of the time, had "psychic numbing, nightmares of traumas, irritability, hypervigilance, tenseness," and that Plaintiff had difficulty adapting due to overwhelming stress. (Tr. 362). Therapist Meloy opined that Plaintiff's limitations were due to post traumatic stress disorder (PTSD) and learning disabilities. (Tr. 357-58).

In January 2005, Therapist Meloy completed a medical assessment of ability to do mental work related activities and interrogatories to assess Plaintiff's condition. She indicated Plaintiff was unable to work due to pain, Attention Deficit Disorder (ADD), and depression symptoms. Therapist Meloy opined Plaintiff had poor to no ability to deal with regular work stresses or maintain attention/concentration. Ms. Meloy rated Plaintiff as having fair (seriously limited but not precluded) to poor or no useful ability in most areas of functioning. (Tr. 343-55).

Alice Onady, M.D., a psychiatrist, initially evaluated Plaintiff on September 4, 2003. Plaintiff complained of problems with her concentration and memory. She was under stress because her son and his wife were living with her and her husband. Mental status examination revealed Plaintiff was alert, oriented, but tearful and anxious. She had a dysphoric mood but appropriate affect. There was no evidence of suicidal ideation. Dr. Onady diagnosed major depression, severe, in partial remission and post-traumatic stress disorder. Since Plaintiff was already on Effexor and Zyprexa, Dr. Onady indicated that Strattera or Concerta should be considered. (Tr. 313-15). On September 17, 2003, Dr. Onady completed a questionnaire for the State agency and reported that Plaintiff's cognitive, social, and adaptation abilities were "poor. " (Tr. 310-11). When Plaintiff saw Dr. Onady again in October and December, 2003, Dr. Onady indicated that Plaintiff was an overwhelmed caregiver. (Tr. 307-09). Dr. Onady completed another questionnaire for the State agency on January 22, 2004, wherein she reported that Plaintiff had a poor to fair ability to perform all mental vocational activities. (Tr. 304-06).

David Chiappone, Ph.D., performed a consultative psychological evaluation on October 29, 2003 for the State Agency. Plaintiff reported she stopped working due to pain and difficulty keeping her ostomy bag in place. While she worked, she was able to follow instructions and

maintain pace. She also reported that she had problems with allergies from the tape used with her ostomy bag. Plaintiff indicated she was severely depressed, with hopelessness, loss of interest in most activities, and anxiety attacks outside home. Dr. Chiappone found Plaintiff to be anxious, tense and depressed, noting that she "cried throughout the interview." Dr. Chiappone noted that Plaintiff did not appear to be malingering. Her intelligence "appeared to be in the low-average to borderline range." Dr. Chiappone diagnosed a posttraumatic stress disorder, a pain disorder due to psychological and general medical condition, and learning disability. Dr. Chiappone assigned a global assessment of functioning (GAF) of 51, but concluded Plaintiff functioned at a GAF of 59.

Dr. Chiappone concluded that Plaintiff should be able to understand simple one and two-step job instructions. He noted that while she related well in his evaluation, she would have difficulty interacting with anyone "who was not very compassionate or sympathetic. She would have difficulty being challenged or confronted in a work setting." Though she could not perform heavy tasks, Plaintiff could cook, do laundry, simple cleaning, wash dishes, shop twice a month for groceries, and attend church on Thursday evenings and Sundays when she felt good. Plaintiff reported having panic attacks in stores her entire life. "Plaintiff is an individual who, in spite of having bladder problems most of her life and anxiety symptoms most of her life, worked until this past summer." Dr. Chiappone noted that Plaintiff's anxiety and depression would interfere with carrying out tasks over time. He further noted that Plaintiff had moderately reduced stress tolerance. (Tr. 277-81).

Robert Gaffey, Ph.D., a state agency psychologist, reviewed the evidence on November 19, 2003. Dr. Gaffey concluded that Plaintiff had mild limitation in daily activities and social functioning, moderate limitation in concentration, persistence or pace, and no repeated episodes of decompensation. Dr. Gaffey indicated Plaintiff "would have difficulty being challenged or confronted in a work setting," but should be able to perform simple tasks without strict time or productivity standards that were not fast paced, and did not require multi-tasking work requirements. (Tr. 288-303). Kristen E. Haskins, Psy.D., affirmed Dr. Gaffey's findings on March 9, 2004. (Tr. 288).

Plaintiff was evaluated by consulting neuropsychologist Jerry E. Flexman, Ph.D. on March 19, 2004. Plaintiff presented with depression and anxiety over having a urostomy, which added stress, memory problems, difficulty with attention and feeling tired. On mental status examination, Plaintiff was anxious and fidgety. Memory testing showed Plaintiff to be in the low average range; she had difficulty with social, occupational, or school function. Dr. Flexman concluded that "the results of the current evaluation...reveal her to be an individual who appears to be functioning within the average range of general intelligence. She does appear to demonstrate a number of symptoms and problems that would certainly be consistent with her report of learning disabilities as a child...Ms. Hitte is not experiencing a general dementia at this point, but she is certainly showing significant psychological and emotional difficulties, which are aggravating her ability to function, which was already compromised due to her learning difficulties." Dr. Flexman opined that Plaintiff is in need of intensive psychotherapeutic intervention as well as continued monitoring of her psychotropic medications. However, Dr. Flexman did not think that a cognitive enhancement program would help her because of her psychological impairments. (Tr. 320-23).

Dr. Flexman completed a medical assessment of ability to do work related activities (mental), on February 16, 2006. He indicated "fair" or "poor/none" abilities to perform most mental work-related activities. Dr. Flexman based these extreme limitations on Plaintiff's severe aggravation of a profound learning disability due to marked emotional problems. (Tr. 444-46).

James LaCroix, M.D., a primary care physician, first saw Plaintiff on November 12, 2004. He diagnosed possible adult ADD, depression, possible bipolar disorder and insomnia. He noted that Plaintiff's psychological symptoms were "obviously NOT well-controlled." He renewed psychotropic medications and encouraged follow up with a psychiatric specialist "ASAP." (Tr. 381). Dr. LaCroix continued monitoring Plaintiff's psychological impairments, adjusting medications as necessary. (Tr. 366, 377-81, 393-416). Plaintiff's symptom severity varied. Plaintiff did not mention any problems with her ostomy bag or frequent urination. In June 2005, Dr. LaCroix reported that medication dramatically improved Plaintiff's symptoms. (Tr. 395). In October 2005, Plaintiff's insomnia and anxiety symptoms were worse due to stress in her home and Dr. LaCroix diagnosed an "acute stress reaction." (Tr. 411). In November

2005, Plaintiff reported significant improvement in her stress and anxiety with medication. (Tr. 409).

Dr. LaCroix completed interrogatories on January 20, 2005. Dr. LaCroix noted that Plaintiff's "personality [and] emotional make-up seem to aggravate/exacerbate minor stressors - [Plaintiff] has very poor coping skills." Dr. LaCroix did not think that Plaintiff was able to perform any work related activities on a regular, sustained basis, in a competitive work setting. Dr. LaCroix opined Plaintiff was moderately restricted in her ability to perform activities of daily living and maintain appropriate social functioning and had a moderately to marked deficit in her ability to sustain concentration, persistence or pace. (Tr. 367-76).

James J. Rosenthal, Psy.D., a psychologist, evaluated Plaintiff on August, 24, 2005, at the request of the state agency. Plaintiff stated that she was not working due to bladder problems and fibromyalgia. Dr. Rosenthal's evaluation included a clinical interview and review of Dr. Chiappone's October, 2003 evaluation and Dr. Flexman's 2004 evaluation. Dr. Rosenthal diagnosed major depression, posttraumatic stress disorder, and a learning disorder not otherwise specified. He assigned Plaintiff a GAF of 55. Dr. Rosenthal opined that Plaintiff had no impairment with understanding, remembering, and carrying out simple instructions. Plaintiff's ability to relate to others, sustain attention/concentration and to tolerate the stress of regular employment were moderately impaired. Plaintiff had fair (satisfactory) to good ability to perform most mental work functions. (Tr. 382-88).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are

supported by substantial evidence, the Court must consider the record as a whole. *Hephner* v. *Mathews,* 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(1),423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley* v. *Secretary of H.H.S.,* 708 F.2d 1048 (6th Cir. 1983); *Kirk* v. *Secretary of H.H.S.,* 667 F.2d 524 (6th Cir. 1981), *cert. denied, 461* U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen*, No. 876189, slip op. at 4 (6th Cir. Oct. 28, 1988). An impairment will be considered non severe only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is

entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner,* 587 F.2d at 323. *See also Cole* v. *Secretary of Health and Human Services,* 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson* v. *Secretary of H.H.S.,* 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner* v. *Secretary of H.E.W.,* 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk* v. *Secretary of H.H.S.,* 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson,* 735 F.2d at 964; *Kirk,* 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips* v. *Harris,* 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Taylor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.,* 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley* v. *Secretary of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway* v. *Secretary of H.H.S.,* 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky* v. *Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley* v. *Secretary of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Nos* v. *Weinberger,* 512 F.2d 588, 596 (6th Cir. 1975).

However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.,* 39 F.3d 115, 118 (6th Cir. 1994).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. § 404.1520a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3); *see Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The first three areas are rated on the following five-point scale: none, mild, moderate, marked, and extreme. The fourth is rated on the following four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. 20 C.F.R. § 404.1520a(c)(4).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then complete a Mental Residual Functional Capacity Assessment form. This form also seeks to evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this

mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. § 404.1520(c) - (f).

The regulations expressly provide that the responsibility for deciding a claimant's residual functional capacity rests with the Administrative Law Judge when cases are decided at an administrative hearing. *Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004)(citations omitted). [20 C.F.R. § 404.1546; § 404.1527(e)(2)].

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## OPINION

Plaintiff's contentions are divided into two main arguments, one concerning her

physical impairments and the other concerning her mental impairments.

With respect to Plaintiff's mental impairments, the ALJ limited Plaintiff to simple tasks with no extended periods of concentration. Further, he noted that she would need low stress jobs with no dealing with the public, no fast-paced work, no production quotas, no above-average production expectations, and no more than minimal contacts with supervisors and co-workers. Tr. 25 (Finding 5). Plaintiff argues that her interstitial cystitis aggravated her psychological symptoms. Plaintiff noted the ALJ rejected the opinions of Plaintiff's treating therapist, Ms. Meloy, (Tr. 28), and failed to evaluate her opinion under any factor required by the Regulations. Ms. Meloy indicated Plaintiff was unable to work due to pain, her ADD, and depression symptoms. Therapist Meloy opined Plaintiff had poor to no ability to deal with regular work stresses or maintain attention/concentration. Ms. Meloy rated Plaintiff as having fair (seriously limited but not precluded) to poor or no useful ability in most areas of functioning. (Tr. 343-55).

SSR 06-03P clarifies the manner in which the Commissioner is to consider opinions and other evidence from sources who are not "acceptable medical sources." SSR 06-03p, 2006 WL 2329939. The Ruling notes:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as chiropractors ... have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists. Opinions from these medical sources who are not technically deemed 'acceptable medical sources,' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.

*Id.* at *4. Further, Ruling 06-03p explains that opinions from non-medical sources who, in their professional capacity, have seen the claimant should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion. *See Martin v. Barnhart*, 470 F. Supp.2d 1324, 1328-29 (D. Utah 2006) (citing Ruling 06-03p, 2006 WL 2329939 at *5-6). Finally, this Ruling states that:

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability

> determination or decision, the adjudicator generally should explain the
> weight given to opinions for these 'other sources,' or otherwise ensure that
> the discussion of the evidence in the determination or decision allows a
> claimant or subsequent reviewer to follow the adjudicator's reasoning,
> when such opinions may have an effect on the outcome of the case.

SSR 06-03P, 2006 WL 2329939 at *7. The ALJ incorrectly noted that Therapist Meloy was not a licensed counselor. The ALJ rejected Drs. Fedrizzi and LaCroix's opinions, along with Therapist Meloy because, "the claimant has only had some treatment by non professional mental health sources (family doctors and a social worker)." (Tr. 29). The ALJ was required to consider her opinion under SSR 06-03P. However, Ms. Meloy did not provide a copy of her treatment records or notes. (Tr. 23). Thus, her assessment was not supported by substantial evidence. Therefore, while the ALJ did not evaluate Ms. Meloy's opinion under SSR 06-03P, such was harmless error because, as the ALJ noted, Ms. Meloy's "assessment is given no weight due to the lack of any supporting records." (Tr. 28).

With respect to Dr. LaCroix's opinion, the Court finds that the ALJ's decision declining to give controlling weight to his opinion is supported by substantial evidence. Dr. LaCroix reported that Plaintiff was unable to perform any work related activities on a regular, sustained basis, in a competitive work setting. Dr. LaCroix further opined that Plaintiff was moderately restricted in her ability to perform activities of daily living and maintain appropriate social functioning and moderately to marked deficit in her ability to sustain concentration, persistence, or pace. (Tr. 367-76). The ALJ properly rejected Dr. LaCroix's assessment as inconsistent with the record as well as his lack of expertise in the field of mental health. (Tr. 29).

To be afforded controlling weight, the opinion of a treating physician must be well supported by medically acceptable clinical and laboratory diagnostic techniques, and must not be inconsistent with other substantial evidence in the record. *See Walters*, 127 F.3d at 530; 20 C.F.R. § 404.1527(d)(2). Because Dr. LaCroix's assessment was not consistent with other substantial evidence in the record, the ALJ was not bound to give the treating physician's opinion controlling weight. *Walters*, 127 F.3d at 530. The ALJ noted that Dr. LaCroix based his opinion on the diagnosis of ADD, yet "there is no clear, objective evidence that she has any attention deficit disorder. Dr. Flexman, who purportedly did neuropsychological testing (though he

reported no scores from his testing) did not diagnose any attention deficit disorder. Dr. Onady, a psychiatrist she saw a few times, thought that Strattera or similar medication might help her complaints of poor memory and concentration. However, she did not diagnose any attention deficit disorder. In fact, no professional mental health source has made such a diagnosis. The existence of some symptoms of attention deficit disorder is not a basis for finding that Plaintiff was unable to perform any work. She takes only a mild antidepressant, Effexor. (Tr. 28).

Likewise, substantial evidence supports the ALJ's decision not to afford significant or controlling weight on Dr. Onady's opinion. Plaintiff claims that the ALJ erred in rejecting the opinion of Dr. Onady. The ALJ rejected Dr. Onady's assessment because she had not seen the Plaintiff long enough to warrant any finding of disability. Morever, Dr. Onady never opined that Plaintiff was totally unable to work. (Tr. 28). Dr. Onady had seen Plaintiff once. This relatively brief period of treatment constituted a valid reason for not fully crediting Dr. Onady's opinions. *See* 20 C.F.R. §416.927(d)(2) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Plaintiff argues that the opinion of the psychological consultative examiner, Dr. Flexman, supported the opinion of Dr. Onady. This contention lacks merit. Plaintiff contends Dr. Flexman said that she had poor or no ability to perform most mental work-related activities. (Tr. 444-46). A review of the ALJ decision explains why he gave Dr. Flexman's opinion no weight. (Tr. 29). The ALJ noted that Dr. Flexman gave cursory answers regarding test performance, but "provided no scores." *Id.* Dr. Flexman based Plaintiff's limitations on Plaintiff's "profound learning disability due to marked emotional problems." (Tr. 445). The ALJ noted that Plaintiff worked for many years at a skilled job, held a driver's license, and never claimed she was illiterate or could not read. (Tr. 29). The ALJ properly rejected Dr. Flexman's opinion 20 C.F.R. § 404.1527(d)(3).

Under the facts and circumstances of this case, the ALJ's RFC finding on the subject of Plaintiff's mental impairments is supported by substantial evidence.

With respect to her physical impairments, Plaintiff argues that, due to her ostomy bag, she must leave the workplace every hour. Dr. Miller reported that he asked Plaintiff to drink 10

glasses of water per day to maintain her health following the removal of her bladder. "As a result, her ostomy bag does fill frequently and she needs to empty it hourly." (Tr. 443). According to Plaintiff, the ALJ stated that he had based a need for easy access to restrooms in her RFC on Dr. Miller's report. Plaintiff contends that, based on this limitation, the vocational expert could not identify any jobs existing in significant number in the national economy which she could perform and therefore should have been found disabled.

In opposing Plaintiff's request for benefits, the Commissioner argues that the ALJ conducted the proper sequential evaluation and considered all of Plaintiff's functional limitations in reaching his residual functional capacity assessment. The Commissioner also contends that the ALJ properly evaluated the medical source opinions of record, correctly finding that Dr. Miller's opinion was unsupported by objective clinical findings and was inconsistent with other substantial evidence of record. We find the Commissioner's argument to be misplaced. A thorough review of the ALJ decision reveals that he did indeed consider Dr. Miller's assessment in determining that Plaintiff would require easy access to restrooms. (*See* Tr. 26). When the VE was asked to consider a person "who would need to use those restroom facilities on the average of at least once per hour for five minutes every hour," he testified that the jobs he identified would not tolerate such a limitation. (Tr. 481). Therefore, we find that the Commissioner has failed to meet his burden at Step 5 of sequential evaluation.

## CONCLUSION

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985). Because Dr. Miller

opined that Plaintiff would need access to a bathroom every hour, and the VE testified that such limitation would preclude work, Plaintiff is precluded from performing work on a "regular and continuing" basis for a 40 hour work week as required by Social Security Ruling 96-8p. Several courts have observed that "the Commissioner takes the position that at step five of the sequential disability determination, only a claimant's ability to perform full-time work will permit an ALJ to render a decision of "not disabled.'"*Mikesell v. Commissioner of Social Sec.*, Case No. C-1-06-517, 2008 WL 495604 at *12 (citing *Barsotti v. Commissioner, Social Sec. Admin.*, Case No. 99-1089-JO, 2000 W.L. 328024 at *3, n.2 (D.Or. March 13, 2000)) *see also Kelly v. Apfel*, 185 F.3d 1211, 1214 (11th Cir. 1999); *Bladow v. Apfel*, 205 F.3d 356, 359 (8th Cir. 2000)). In other words, "[a] claimant is disabled if he cannot perform full-time work. SSR 96-8p." *Criner v. Barnhart*, 208 F. Supp.2d 937, 956 n.21 (N.D. Ill. 2002); *Gotz v. Barnhart*, 207 F. Supp.2d 886, 897 (E.D. Wis. 2002). "[P]art-time work does not constitute working on a 'regular and continuing' basis." *Carr v. Apfel*, 1999 W.L. 1489892, *5 (N.D. Ohio 1999). Thus, the proof of disability is strong and opposing evidence is lacking in substance. We find, therefore, a remand in this matter would merely involve the presentation of cumulative evidence and would serve no useful purpose. *Faucher*, 17 F.3d at 176. Accordingly, this matter should be remanded for an award of benefits.

**IT IS THEREFORE RECOMMENDED THAT:**

This case be **REVERSED** pursuant to Sentence Four of 42 U.S.C. § 405(g) consistent with this opinion and **REMANDED** for an award of benefits.

Date 9/14/09

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS REPORT & RECOMMENDATION

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

E:\SOC_SEC\Batten\R&R08-295.wpd